May it please the court, my name is Eric Cassidy and along with my co-counsel Ms. Zenobia Harris-Bibbins, we represent the relator in this matter. There are two fundamental issues before the court under the anti-kickback statute. The first issue, what is sufficient evidence to raise a fact issue under the one purpose rule and to establish an intent under the AKS? Second, did the district court apply the correct legal standard for signature or mens rea under the AKS in coming to his decision? We would offer up to the court that the correct legal standard is in fact similar to but not what the court applied. As we outline in our briefing, the court applied the Davis holding which defines signature and in particular willfulness and willful as bad purpose. Now I appreciate the court's struggle on this issue. If we look at Fifth Circuit precedent on the issue of signature, there is a dearth of actual precedent. There's the Davis case. There's also the St. Junius case and the district court did not cite to the St. Junius case. But in Davis, the court does two things. One, it considers whether or not there is a heightened legal standard for finding willfulness under the AKS and the court raises the issue but never decides it. And then two, the court applies what had been until that time the traditional standard or And to that extent, the court defined willfully as an act that's committed voluntarily and purposely with the specific intent to do something the law forbids, that is to say with bad purpose either to disobey or disregard the law. Now, that definition includes specific intent and it's our position that specific intent is defined as with bad purpose. Under the 2010 amendments to the anti-kickback statute and also under this court's precedent in St. Junius, it was clarified that specific intent is not required under the mens rea requirement or signature requirement for the AKS. So that language in the middle of Dakes, which is the leading precedent for courts in this circuit to determine signature, is actually null and void or nonexistent. So the fact that it says specific intent and it requires a showing bad purpose is not actually the law. It would be our position that first that the district court erred in applying that standard and you see it throughout his opinion. For instance, in discussing Shoreline, the court acknowledges that looking at the evidence of intent, the emails, where Omnicare employees are internally discussing, giving credits and discounts at the same time that they're trying to renew contracts, which is a clear violation under the anti-kickback statute. He acknowledges that they are doing that kind of activity, but he says he can't see that bad purpose, that heightened standard that is required. It is our position that he was applying the incorrect legal standard. If I was going to point this court to another circuit, I would suggest the court looks at U.S. v. Bay State Ambulance and Hospital Rental Services, it's 874-F2. The district court ultimately, though, I mean, I thought it just said, just to sum up what he said, is I don't see anything in this case that ordinarily wouldn't occur in usual business transactions. So, I mean, it was not a matter of bad purpose or otherwise, I mean, it was just he saw nothing, he saw no Santa or violation of the anti-kickback statute. I think when you look at the court's opinion and even the hearing from the motions for summary judgment, you see the court routinely saying, this looks to me like common business practices. And he makes the statement in his opinion that the collection activities are very similar to what his law firm would have done. What is the most egregious or just two or three of the more egregious violations of the statute? In other words, I can understand the district court's point of view to this extent, that whenever you are dealing with a client, you don't want to make the client unhappy. You're willing to cut some corners with the client in order to keep a client. That's an ordinary business practice that really doesn't have any kind of scientin to violate the law but to keep a client. So where do you cross the line, in this case, where are the facts that cross the line in wanting to just satisfy and keep a client as opposed to inducing him not, by some gratuity, not to leave you? Let me answer your question with two points. First, there's a fundamental distinction between collecting past due debt in the private sector and collecting it when you're working in a regulated health care environment. And the statutes and case law routinely point this out. Why is that? If a law firm decides to give $200,000 credit to a client to induce them to come back. What I've asked you to do, if you could, is to tell me, in this case, I mean, let's put it down where the little goats can eat it here. So I understand, not the theory, but I understand the application of it in this case. I think you've got the briefing on each party going sniff by sniff. So let me approach it this way. I think the most egregious fact is the prompt pay discounts. The prompt pay discounts. Omnicare gave prompt pay discounts to four of these sniffs, Harborside, Fundamental, Life Care, and Five Star. The prompt pay discounts in this time frame for three of those, Harborside, Five Star, and Fundamental, totaled between $3.3 million and $3.5 million. Now, why? What's the total? The value of the contract is, of course, it relates to $3.5 million or whatever it is. Each sniff has a number of nursing homes underneath it. So each contract is different. If you're talking about total damages, and they're tied to anything that's tainted by kickback, it would be around $200 million. If you're talking about the actual credit. You're talking about $3.5 as relates to $200 million? $3.5 million in credits given to these sniffs. Now, we're going to link it to damages, which is not before the court. The actual damages, which would be, they give credits on Medicare Part A, and then they get the Medicare Part D business. That is where the money is. I understand that prompt payment discounts is not unusual. I mean, those are benefits that you get, and you get a benefit back from it, that is prompt payment. Now, where in this case do you say it crosses the line? The Office of Inspector General, in their advisory opinion 0803, looked at this issue and said that prompt pay discounts, depending on the facts and circumstances, can in fact be a violation of the AKS. I understand that, but I'm asking you to give it to me in this case. The specific issue, if you look at what OmniCare did compared to that OIG opinion, they did not offer prompt pay discounts in the context of billing or collection. Now, the OIG says, yes, it's okay to do prompt pay discounts if you're talking about collecting or billings, but when you cross that line and you do it to induce patient referrals, that's where you have a violation of the AKS. That's precisely what we have here. If you look at the issue, the five-star- So you're saying this discount was totally divorced from collection and billing? I think there's evidence in the record- They just offered up a prompt pay discount out of the blue. If you look at Five Star, Your Honor, which is at 31212, the ROA site, Pat Keith, who's an executive at OmniCare, goes to Five Star and says, in advance of our contract renewal, I would like to offer you a prompt pay discount. And he routinely solicits them, renewing their contract and providing new patient referrals only by saying- This is not in connection with any audit or any complaint that some bills were inflated or exaggerated or more than they should- It wasn't in connection with any of that? The specific emails that- This was, we're about to renegotiate our contracts, let me offer you some discounts. That's all it was. In fairness to the record, Your Honor, the specific emails that I have referenced at You're renewing your contract, let me give you a prompt pay discount. Now, at the same time, outside of that email, were there negotiations on the debt side? Yes, of course there were. That was how OmniCare did business. They would simultaneously give credits and debits and not collect on past UAR while renewing contracts. So if you look at LifeCare, the interesting thing about LifeCare is the fact that there is a settlement agreement on debt and then an addendum to their current provider agreement where for the first time ever they get a prompt pay discount. That's a quid pro quo. All right. Pardon me. I'm not currently trying to control your argument, but I would like to hear something about the False Claims Act and your time is running out. Yes, Your Honor. I think probably the most valuable thing I could do is discuss Escobar and its relevance to this particular case. Yes. Ten minutes in and we get to Escobar. I think Escobar, at the risk of overstating a lot but trying to characterize it, on the one hand, it changes everything in this appeal. On the other hand, it changes nothing. Now OmniCare has kind of bet their house on express certification. Escobar holds very clearly that implied certification is sufficient under the False Claims Act. Okay. But I think a very key thing here that really you haven't touched on in any degree is what evidence under Escobar's definition of materiality is there that the government would do anything different if they knew, for example, let's say they knew about the Harborside deal where giving you a credit against, you know, payments every month of $37,000, whatever the number was. If they knew about that deal, what evidence is there that the government would not have paid to reimburse on the medicines that were being prescribed and so on? Use Escobar's example, the evidence would be the mine run of cases where the government has consistently held that a violation of the AKS makes you ineligible for payment under the FCA. In this case— Where in the record do we have evidence of the government treating this kind of situation, not just anything somebody says is an AKS violation, but this kind of situation specifically—and I'm just using Harborside because the district court said that was the closest case. So using what happened in Harborside, taking your spin on it, where is there evidence in the record that the government wouldn't pay had they known about this transaction? Two answers. One, that question is answered decisively in the government's statement of interest that they filed with the court, and that's at ROA 2185-206. That's the statement of interest that deals with the motion to dismiss where they're very clear that there is a finding of a violation of the AKS that they would not pay the claim. Now, if your specific question to me is, in terms of materiality, do we need additional evidence in the record to show that the government would not pay, I don't think we do. I think the fact that the mine run of cases, to use the Escobar language, consistently holds that if there is a finding of a violation of the anti-KPAC statute, then you are ineligible to pay under the False Claims Act. I think that ends the discussion. However— I mean, the government just announces that, that's enough. We don't need any evidence of what they actually did or whether they've actually been faced with a similar situation, because the anti-KPAC statute could encompass a situation where somebody walks up and says, I am going to pay you per patient referral. I mean, a super obvious, you know, neon lights, versus something that's very technical and convoluted and whatever, which is some of what you're arguing here. Some of what you're arguing here, even taking all of your stuff, is a hyper-technical violation. And so, are we to assume that the government, just because we can slap an AKS label on it, now they're not going to pay? No, I don't think we should go quite that far, although there is not a single case that we've been able to locate in the jurisprudence under the AKS where there has been a finding of the violation of the AKS and the government did pay. We haven't been able to find a case like that. But I don't think we need to necessarily— Do we have to look for cases, or are we looking for, like, what are they doing? I mean, do we need— Let me just—would you give two more minutes to each side, please? Great. Okay. So, are we looking—do we have to find, like, a casebook case, or are we looking for evidence of what the government does? I think we're looking for evidence of intent, number one. And under the FCA, the intent has to be actual knowledge, but it can also be deliberate indifference or recklessness. But I'm still on materiality. Well, in terms of materiality, it is material to the government that if any kind of health care entity gives unearned credits, unwarranted discounts, or fails to collect on past-due AR to get patient referrals, that in and of itself is sufficient. But that's not what's happening in Harborside, is I understand they're giving a credit, and the problem, as you see it, is to give a credit, I have to be having money coming the other way. Right. I can't credit you something if there's not money coming the other way, right? Well, the Harborside issue, I mean, there's— Maybe I'm misunderstanding. Go ahead. Well, I mean, there were several issues. One, in Harborside, they negotiated a settlement of their debt where they agreed to pay in a renewed contract $37,500, and that is per month. Right. And they have to continue paying that unless the contract ends. That is a quid pro quo. If you pay us money, we'll give you that credit. If you decide to re-sign with us and send us more patients, we will give you $37,500 per month. That's a quid pro quo. But that was money that made up. Okay. I have a question. Yes, sir. Certification. To get to certification. Where is the certification here that the defendant, Omnicare, made? Because I understand your theory. The entire false claim is that it's based on a false certification. Where is the certification that you rely upon that it made that makes its claim subject to the False Claims Act? Yes, Your Honor. The implied certification that Omnicare is subject to comes in two parts. One would be the cost reports. The other would be the certifications that are done by the plan, the Part D plan providers up to the government. What certification did Omnicare make, Omnicare? Which certification did they make that holds him liable under the False Claims Act? We don't need one to find liability. Okay. So they made none? No. Answer my question, though, if you will, please. Yes, sir. They made none directly. Okay. However, the Part D. So what do you rely on? The Part D plan providers are agents of the government. And by the Part D plan, under the case law, and we've cited in our brief, the Part D plan providers have made those certifications to the government. And they require their subcontractors, Omnicare, to also comply with all federal laws. That's what we're relying on. And we've cited cases in our briefing that shows that that is sufficient precedent for an implied certification theory. I still don't get it. Can I ask you a quick question about dates? Okay. So we know that there was this compliance training required by the CIA. But prior to that, there was supposedly voluntary compliance training. What was that on the AKS, and was that explaining that you're not supposed to pay for referrals? Yes. That voluntary compliance training? Yes. So that predates the CIA? Omnicare was always under one kind of CIA or another during this time period, whether it was the one that is at issue in this case or others. So they developed a compliance program that covered the AKS. The testimony in this case is from Pat Keefe and Richard Rykoff, and they say very clearly that they trained all their employees that if you gave a credit or discount, that could be a violation of the AKS. So arguably, that training is sufficient to create sufficient specific intent. Okay. Okay. Good. Thank you. Now we'll have from Mr. Omnicare, we'll hear from Mr. Sinker. Thank you, Your Honor. May it please the Court. Craig Sinker, appearing for Omnicare. Clearly, I have a lot of ground to cover. I'm going to try to cover multiple hurdles in Relator's case that she did not clear. And Relator, of course, on summary judgment, had the burden to establish every element of her claim under the False Claims Act, and she failed on at least three separate elements. And let me just run through them quickly, and then we can talk about each of them in more detail. First, of course, she had to prove that Omnicare violated the anti-kickback statute by forgiving debt as a willful kickback for patient referrals. And we can talk in a minute about what willful means, but there was no evidence of any such audits, slow-paying customers, not a corrupt agreement made with criminal intent. Second, because there's no civil cause of action under the anti-kickback statute, the Relator also had to prove each element of a False Claims Act cause of action, because the AKS violations supposedly translated into a false claim presented to the Governor. But the evidence didn't support that either, for multiple reasons. Relator couldn't prove that Omnicare was responsible for any false statements to the government, and yes, she still has to prove that, even after Escobar. I'll talk about that in a moment. And second, Relator had no evidence tying any supposed anti-kickback statute violation to any actual claim for payment. We didn't hear anything about that, incidentally, from Mr. Cassidy a minute ago, or anywhere in Relator's two briefs. Claim for payment to whom? To the government? Sure, a claim to the government, or a claim for government funds. Any claim, whatsoever. Last element I'd like to talk about is that Relator had to prove that someone at Omnicare acted with scienter, both under the anti-kickback statute and under the False Claims Act. And the District Court correctly found that the Relator had no evidence that anyone, any individual at Omnicare, had such a culpable mental state. So where does materiality fit here? Well, materiality is certainly an element of a False Claims Act case. And I would agree with you, Your Honor, that there was no evidence presented below that in the wake of Escobar would satisfy a materiality showing. And so what evidence would we be looking for? Because they say the government has said, man, if there's an AKS violation, we're out of here. And that's kind of an easy thing to say, like we don't like violations of the law. I feel like Escobar's looking for a bit more than just kind of the Boy Scout oath here. And so what evidence would we expect there to be? What evidence should be, if we were to remand this for evidence of materiality, what would we be looking, what would the Court be looking for? Well, I hope the Court won't remand it because there are so many other reasons separate and apart from materiality. But I think to, just to talk about Escobar, I think what it's getting at is that you need actual factual evidence to show whether the government would consider it important in deciding whether to pay a claim. So has the government paid similar claims before? Have they rejected similar claims before? We clearly don't have that evidence. Zero. How would they get that evidence? Well, they would have had to find it in discovery, either from the government or from other parties who have been engaged with the government in claims like that, or from the public record. But they didn't make any effort to do that. And so to the extent that that's, the Court finds that that's a requirement, that would be another reason to affirm. Well, isn't that a requirement? Go back to your argument. Go ahead and make your argument. Yeah. Can I just finish that out? Isn't that a requirement? You said if the Court finds. I thought it is a requirement. Materiality. I think materiality is a requirement. Okay. I'm, I'm, it's not one that's been briefed, and I don't think it's necessary for the Court to rely on materiality for its decision, but of course, I do think that it's an adequate ground to affirm in and of itself. I don't think the Court needs to get to materiality because there's no false statement to begin with. And as long as we're talking, I was going to talk about the AKS first, but let me come back and talk about Escobar first, because the, um, the Supreme Court's decision, I think, changes the landscape a little bit on this issue, but the result is really the same, and I don't think it makes any change, certainly, that helps the relator. Because in the time period relevant to this case, an anti-kickback statute violation does not automatically make a claim false. So put aside materiality for a second and start with falsity, which comes even before materiality, because, uh, this, and the Congress did amend the law in 2010 to change that. So today, a, an AKS violation, a, if a claim is submitted pursuant to an AKS violation, that claim is a false claim, but that, that was not a retroactive amendment. This Court in the Gonzales v. Fresenius case held that, and all of our claims here today predate the amendment. So what we're under is this Court's precedent in the Thompson case, which specifically held prior to the 2010 amendment, that an anti-kickback statute violation does not automatically make a claim presented false. And that's because this Court has long expressed concern with differentiating false claims act violations from ordinary breaches of statutory duties, and in a series of cases, the Court has held that at a minimum, you have to show that the defendant made an actual promise to comply with the law, and that includes when you have an AKS violation. That's what Thompson holds. So the Thompson Court required the plaintiff to show that the defendant had made a separate certification, a promise that its claims were in compliance with the anti-kickback statute, and Escobar did not change that. On the contrary, the Supreme Court specifically declined to rule that that's the mere act of making a claim impliedly certifies that the claimant has complied with all laws, material or otherwise. Because it found in Escobar, they went through a long discussion, because they weren't ready to go there, that the Supreme Court went through a long discussion about the fact that the statements that the defendant in the Escobar case made were accompanied by half-truths. There were claims that included codes, statements that were made at the time of the claim that were misleading, and that's why the Supreme Court allowed or remanded the case and potentially allowed it to go forward. Here, Omnicare is not alleged to have said anything at the time that it presented its claims or at the time that the nursing homes presented their claims, as the case may be, about, it didn't say anything about debt forgiveness, about the anti-kickback statute, anything at all, no statements. Now, Relator did allege— In other words, you're saying that Omnicare never made any certification to the government with respect to any aspect that's before us now. That I have not said. Now, I'm getting to certifications next. What I'm trying to distinguish— I didn't mean to interrupt your argument. Oh, no, Your Honor, and it's a good clarification, because what I wanted to say, first of all, there are statements in many cases of false claims act cases, there are statements that are made at the time the claim is presented for government funds. That's what Escobar is about, and that's what Escobar requires, a false or misleading statement when you ask for money. What we're talking about here is certifications made at a different time, so that later in this case is alleged that Omnicare made certifications in advance, promising that it would comply with the law. But who did it make those certifications to? The only certifications in the record are made to state Medicaid. There is no certification in the record made to Medicare. So, if we go back to Escobar and assume that it did not eliminate conditional—that payment is a condition for a false statement, then this had nothing to do with the payment that was made to the nursing homes. So, in other words, any certification that Omnicare made was not material to the payment of the claim at issue? That's certainly true, because Omnicare didn't make any statements with regard to Medicare Part A. So? Should I talk about the three programs? Because I think there are three separate Medicare and Medicaid programs. Whatever your argument, you make your argument. No, but I think it's responsive to Your Honor's question, because there's three separate programs. There's Medicare Part D, Medicare Part A, and Medicaid, and each of them works a little differently with regard to certifications. So for Medicare Part D, Omnicare made no certification—there's no record certification of any kind. I heard my adversary say that there are certifications made by the Part D plan sponsors. That might be true. There are regulations that suggest that that's supposed to happen, but there's no evidence in the record that that did happen. So there's no evidence of that, no certifications at all. No certification for Medicare Part D of any kind. Regarding Medicare Part A, these are the cost reports that the nursing facilities, the SNFs, are supposed to submit to Medicare Part A. Omnicare doesn't submit those. Omnicare doesn't have any direct dealings with Medicare Part A. Do I understand the record correctly that certifications or any other relationship to Part A are not involved in the claim that they are making here? I heard that they—I mean, I read that they disavowed—someone said they disavowed that their case rests to any extent upon certifications that may have been made to—under Part A. Is that incorrect? I think that's incorrect, Your Honor. You can ask my adversary whether they've stopped relying on that, but I believe their claim is that cost reports that the SNFs—not Omnicare, but the nursing facilities—submitted to Medicare Part A contain certifications promising that the cost-reported claims were in compliance. They said that Part A has nothing to do with the anti-kickback statute. I don't think that that's— They didn't say that either. I don't think that's their argument, but I can't—I would hate to try to characterize their argument. Go ahead. But I think that the point on Medicare Part A is that the only certifications that are alleged to have happened are made by the SNFs. First of all, those aren't in the record either, with the exception of 13 cost reports for 12 specific facilities for one SNF. And even as to those cost reports, there is zero evidence that Omnicare had anything to do with them, knew what they said, knew what was in them, had anything to do with submitting them. So you can't hold Omnicare liable for a false claim based on any certification to Part D or Part A based on what's in the record. So you need some actual certification. So then there's Medicaid. Now, Medicaid would be claims that are presented to the states, state Medicaid agencies, and there are Medicaid agencies in every state or virtually every state, and Omnicare would make claims to Medicaid. For Medicaid, there were some certifications in the record, as the district court found. There are some promises far in advance of the claims that are made that— Omnicare made to Medicaid. To Medicaid, to state Medicaid agencies. Each state Medicaid agency— Medicaid agency made the payment. Medicaid agencies would make the payment on the claims, right. So here, though, there was no evidence that Omnicare knew that those certifications were false. We'll get to that in a second. But also, there was no evidence that tied any certification to an AKS violation. Because even if we assume that Omnicare, that Relator, could prove an AKS violation, which she can't, and I hope I'll have a chance to talk about that, too, she would still have to prove that the violation resulted in a false claim to Medicaid. And a claim— I think you have the confusion with the A and the B issue, and that is that the Relator is arguing that Omnicare wasn't trying to induce Part A referrals, it's trying to induce Part D referrals. So that's, I think, the logic is, how can there really be a Part A violation based on that theory? Can you comment on that? That's a fair question. I think the Relator's theory, as I understand it, is that Omnicare was essentially trading the debt that the facilities owed on Part A claims in exchange for the ability to get Part D patients. Again, there's— That's not a direct Part A. It's not a direct Part A. I agree with that. I think that's the confusion. Right. I think the Relator's argument is that the SNFs, the facilities, are claiming under Part A and that they're lying about their compliance with the anti-kickback statute, but there's no evidence that Omnicare had anything to do with any such lies or even knew about them, and there was no AKS violation. But getting back to the point that she has to tie the violation to certification, to the claim, we're talking about Medicaid now, Relator's briefs don't even mention this argument. I think that's telling. They don't explain how a Relator can satisfy it, even though this was part of the district court's reasoning in entering summary judgment, because it's only a false claim if Omnicare is requesting payment from the government or if government funds for a claim that arose from an AKS violation. So and that requirement is clear from the language of the certifications that the Relator is claiming. They talk about the fact that the claim, you're warranting that the claims you make will not result from violations at all. Let me ask you this. This hasn't really been addressed, and maybe it's not relevant here, but in criminal cases involving doctors that sort of inflate their bills and whatever, we've seen some of those. There's this notion of an offset for what you would have had to pay anyway. I mean, in other words, this patient was going to need X but didn't need X and Y. So Y would be the only thing that you could really hold this doctor accountable for. Is there a feeling here of that or, I mean, a sentiment of that in this analysis? In other words, these patients are going to get medication, and the government's going to pay for that, for whatever portion of that it's responsible for under Medicare Part D, whether Omnicare is the provider or some other pharmacy is the provider. Is that part of this analysis at all? Well, let me try to answer it this way. I mean, I'm not sure I'd put it exactly the way that Your Honor did, but I would say that typically when the courts look at whether there has been an anti-kickback violation to begin with, they look at whether there was some overpayment. Usually if you're paying somebody for referrals, you're paying them more than they would be entitled to for the actual services they were provided. And so if you put that into the context of this case, there is zero evidence that Omnicare gave even a penny more than it should have given or than any SNF was entitled to as a debt after lots of audits, after lots of disputes. So if you're talking about... Well, and taking it one step further, is there any evidence the government paid more for anything than it would have, but for this whole thing? Because isn't that the bottom line of this whole thing, is the government ending up paying more or being charged more at least? That's certainly an important point that the government is not, there's no evidence that the government has been harmed at all, or certainly that any patient has been harmed at all. I'm not sure that would be a defense to an anti-kickback violation, but it would be a defense potentially to a false claim if the falsity is based on a factually false claim of too much money. I don't think that's the claim here. And I just want to be clear, while you're talking about the False Claims Act, you're not conceding that there's any violation of the anti-kickback statute. Far from it. Your point is just that where there may be a violation of AKS, it needs to be tied to the FCA in order for the related claims to go forward. Exactly right. And just to finish up on that point, so in order for a claim to be false on the facts of this case, there would have to be evidence that as a result of some agreement to trade debt forgiveness for referrals, a nursing home sent federally insured patients to Omnicare whose services were then billed to the government. Otherwise, there was no claim made for services that resulted from an anti-kickback violation. There is no evidence of that. The relator had the burden to prove that, and she didn't do it. So could these people be private pay, or what is the, that's the argument, that they had to show they weren't private pay, that they were government pay? No, the argument is that there's no evidence that any, that there was any completed quid pro quo that actually led to an SNF sending. Well, I'm just having trouble with this Harborside thing. I mean, it does seem like they're not going to get the $37,000 unless they fulfill the two-year deal. How can, your spin is, well, the kind of you can't give a credit without an offset, but isn't that a little problematic? Why couldn't they just pay $37,000 a month, period, you know, and just write a check if there's no deal, if there's no offsetting amount? I think the point to be made is that there's no evidence of why that, why the deal was structured that way. There's no evidence it was being done as some sort of a corrupt bargain. It was a settlement of reasonable amounts. There's no evidence otherwise. By the way, part of the reason that there is no evidence, there's really two reasons there are no, there's no evidence one way or the other of what Omnicare or the SNF were thinking in making this deal. The first reason is it occurred before the relevant time period in this case. Relevant time period is 2005 to 2008. The harborside contract that my adversary is harping on was in 2004. So but putting that aside. But was it continuing into this time period? It would have theoretically continued into the time period, but the actual agreement took place beforehand. Then the other reason there's no evidence in the record is because the relator didn't depose the relevant people or didn't ask them the relevant questions. There's no testimony in the record about what anyone was thinking. And that gets back, I think, to. Well, but I mean, people are seldom going to say, yeah, I took a bribe, you know, whatever. I mean, it, it isn't, aren't all these emails and the sort of facts themselves enough from which at least to infer intent? Absolutely not, Your Honor. And I think if you compare other anti-kickback cases where sufficient evidence was found, you'll see a much, a much different scenario. Which case would you want me to look at? Well, you can look at the Pogue case, which the Pogue, P-O-G-U-E, that the, that the district court relied on. I'll find you a few others. I mean, there's the Vernon case. There's the, I mean, the cases tend to show things like furtive conduct. The Starks case in the 11th Circuit is another one. You can see, you, you have evidence. So if you're bold about it, then that, that's okay. No, I mean, look, if there, if there were evidence and sometimes, and a lot of the criminal cases in particular, you'll see people being bold about it and saying, okay, I'm gonna, I'm gonna pay you a $10 commission. This is, a lot of the cases actually are commission payments. I'm gonna pay you $10 for every patient you refer to me. And by the way, and so then that's, that's an inducement. That would be a quid pro quo, which would qualify as an inducement. Question then would be, is there criminal intent? Because you still need to show knowing and willful conduct. And for that. Did you agree on the dates with, with your counsel opposite about the voluntary compliance prior to the CIA? They were still getting training. So if training on the AKS is enough to show intent, then it was there during the relevant period? Look, I, I think I would not agree with Your Honor's statement, but maybe for a slightly different reason. I don't dispute that Omnicare employees were trained about the AKS. What I do dispute is that any training would cover the sort of fine predations that are at issue here. The AKS is extremely complicated. There are lawyers, and thankfully for me, I'm not one of them, but there are many lawyers around the country who do AKS compliance and nothing but. They make their career of it because it's extraordinarily difficult. And they missed this one. I mean. Well, I don't think so because I don't think there's a violation, but in any event, it's, it's very difficult. I would fire the lawyer that did this if I were Omnicare. It's extremely difficult to tell whether a particular event is a violation or not in many cases. And so the AKS, therefore, requires willful intent. And cases all over the country, including in this court, hold that that means you need to know that you're violating the law. You don't need to know. You're saying the training that was given wasn't specific enough to have created a concern about the way these transactions were being structured. The only evidence of the training is that the Omnicare employees knew that you can't buy referrals. You can't trade for referrals. That doesn't mean they knew, but you can't have a reasonable settlement with your customer when you hope that the customer will give you business in the future. That is not a violation. And if it were to be somehow a violation and this court were to find it, then no one could know that. And certainly Omnicare wouldn't have known that. And you need willful conduct, knowledge of the law. You don't need to know that it's an AKS, specifically an AKS violation. You do need to know it's a legal violation. The Davis case, the Supreme Court in Bryan, the Fifth Circuit pattern jury instructions, the government in this case, or later in this case, her summary judgment opposition papers, pages 9 to 10, concede that that's the standard. She's waived any argument to the contrary. St. Junius does not hold otherwise. No court has held it to mean otherwise. In any event, the court in St. Junius found that the defendant knew that she had violated the AKS, making anything else in that case dictative. Thank you very much. Thank you, Mr. Cassidy. Ms. Bivens? May it please the Court, I have a lot to cover in five minutes since there was—oh, I get two extra minutes? No? Yes? Two extra minutes? We'll give you two extra minutes. Thank you. So let me start off with some arguments that were made earlier by opposing counsel and also to clarify a few things. First of all, I think that it cannot be disputed that Omnicare made certifications with regard to the anti-kickback statute. If you look at our reply brief, we list them out by state. I think the best certification to look at is Georgia. Omnicare promises that when it's accepting Medicaid money, they hereby certify that they will not violate the anti-kickback statute with respect to their performance under this agreement. So to be clear, Omnicare, which, remember, is the largest long-term care pharmacy in the entire country, has been dealing in this industry since 1981, has been repeatedly fined by the government for violating the False Claims Act and the anti-kickback statute such that they are under a compliance agreement to train every single employee. If you look at their 10-Ks, they notify their shareholders that if they violate the anti-kickback statute, it could result in them not receiving payment and being able to continue under the program. So Omnicare, during this time period, and if you look at the Templin case, even before the relevant time period, was aware that they had to comply with the False Claims Act and the anti-kickback statute in order to receive taxpayer dollars under these health care programs. So the promises made is really not the issue here. And if you look at Escobar, going to the materiality, we do have evidence in the record that the government would not pay if they knew that Omnicare was trading discounts and write-offs for the Statement of Interest issued by the Department of Justice. Do you consider that to be evidence, not legal argument? No. And if we do need additional evidence, you can go to the Health and Human Services website. It's public. Talking about the cost... I'm going to go and find evidence for you? No. We cite it. We don't cite it. But I'm not asking you to go find evidence, Your Honor. That's what a record is all about. There has to be evidence in a record. It's not up to the Court of Appeals to go find it on a website. Okay. Then we will go back to our Statement of Interest. And I think it's important to note that when you're dealing with compliance with federal law, the Department of Justice is the only department that can say, it's okay for you to defraud the government. Health and Human Services can't continue to pay, knowingly continue to pay, somebody that they know is violating a federal law. So our position is the Department of Justice, by issuing in this specific case... But see, Escobar doesn't say that. I mean, Escobar says, we recognize the government could say they ain't paying, but do they really not? So they're not looking to whether somebody can officially authorize a fraud. They're looking to what really happens kind of out on the street. And I'm not sure some document filed by the government and the district court is going to tell us that. Well, in Escobar, the court acknowledges what this court has held for many years. You can look at the Longy case. That what the court should be looking at is what the government would have a natural tendency to do in the circumstance. And I think it's not a stretch to say that the government would not pay for a claim that's tainted by a bribery scheme. So I don't think this specific case... But that's not the question, is it? The question is whether you make a false claim. It's got to be a false claim somewhere, not what the government might do if such and such happened. So if we're talking about why the claim is false, the claim is false because of the anti-kickback statute violations. That's what in this case would make the motion... Excuse me? When you say the government wouldn't pay a claim tainted by a bribery scheme... That's right. That presupposes that it was a bribery scheme. And what about this case? Yes. The first thing we have to establish is that there was a violation of... A bribery scheme. Yes. And what they maintain is that they were giving some discounts and reductions in negotiating a billing dispute. Right. Isn't that what their claim is? I mean, that seems to be what they're claiming. That they were just doing regular things in the regular course of business. But that's a false equivalence. This is not regular business. This is a highly regulated industry. Right. And any time a discount is given... Let me give you an example. The anti-kickback statute is very broad. It punishes all offers, solicitations of acceptance of anything of value. Anything. Right. It was so broad that almost every discount given by a company was prima facie a violation of the anti-kickback statute. So what the government did was they enacted two safe harbors. The statutory safe harbor and the regulatory safe harbor. That would help protect some discounts that had mutual benefit for the government and for the companies. So the government said discounts typically are broadly in violation of the anti-kickback statute. But they offer protection. You'll note that Omnicare has not tried to seek protection under any safe harbor. If they were on notice, which they were if you look at their 10Ks of these safe harbors and their ability to get protection from the government, they clearly would have done so. So it's not like this is a surprise to them and this is some technicality that they were not aware of. Omnicare, this very sophisticated company, was aware that discounts were questionable and they were suspect. You can look at OIG opinions. You can look at the OIG opinions specifically about the safe harbors, that discounts are immediately seen as suspect. And Omnicare, this very sophisticated company, could have sought guidance from the OIG with an advisory opinion. They didn't. We'll give you about a minute to sum up your argument. What do you want to leave us with? I want to leave you with the idea that this is a very sophisticated company. They know about these certifications. Their executives have testified and it's in the record, Pat Keefe, and everybody at that giving anything of value, including discounts, could run afoul of the anti-kickback statute. This is not a mom-and-pop operation. This is a national corporation that deals with these regulations on a daily basis. They knew that what they were doing could run afoul of the law and if you look at the record, particularly with the Harborside example, where they have it spelled out in a contract, we will give you money in exchange for keeping your nursing home patients with our company. That is a quintessential kickback scheme. Thank you very much. Thank you, Ms. Bivens.